UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRACY PLATERO, ET AL.,

                              Plaintiffs,

            -v-

GRAND HYATT,

                              Defendant.

---

22 Civ. 8680 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves competing motions to confirm and to vacate an arbitral award.

Plaintiffs are former banquet servers (the "Banquet Servers") employed at the defendant Grand

Hyatt Hotel in midtown Manhattan (the "Hotel") and members of the New York Hotel and Motel

Trades Council, AFL-CIO (the "Union"). Plaintiffs commenced this action against the Hotel and

the Union under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §

185. They have moved to vacate an April 20, 2023 arbitral award (the "Award") in the Hotel's

favor, which resolved the number of severance days to which those Banquet Servers who ceased

employment at the Hotel during its COVID-19 closure are entitled. The Hotel has cross-moved

to confirm the Award. For the following reasons, the Court grants the motion to confirm and

denies the motion to vacate the Award.

## I.  Background

### A.  The Banquet Servers' Classification Under the Industry Wide Agreement

The Hotel, located adjacent to Grand Central Station, employed more than 60 banquet

servers—18 of whom are the plaintiffs in this case. Dkt. 23 ("Bokerman Decl.") ¶¶ 5–6.

Because the Banquet Servers were members of the Union, the Industry Wide Agreement

("IWA") governed the terms and conditions of their employment. *Id.* ¶ 3. The IWA is the collective bargaining agreement between the Union and the Hotel Association of New York City, Inc. ("Hotel Association"). Dkt. 26 ("Ruocco Decl.") ¶ 4; Dkt. 16 ("Kaiser Decl."), Ex. H ("IWA"). The Hotel, a member of the Hotel Association, is a signatory to the IWA. Ruocco Decl. ¶ 5.

The IWA classifies banquet servers as "tipped" employees. IWA at 76. Typically, tipped employees derive a substantial portion of their income from customer tips. Ruocco Decl. ¶ 10. As such, tipped employees are generally paid a lower hourly wage than non-tipped employees. A banquet server's status as a "tipped employee" affects how the IWA calculates the pay rate when a banquet server takes paid time off (*e.g.*, holiday, vacation, sick, and personal days)—what is often referred to in the hotel industry as "benefit days." *Id.* ¶¶ 10–11. Under the IWA, when a non-tipped employee takes a "benefit day," he or she is paid a regular daily rate of pay; whereas a tipped employee is paid double the daily rate of pay for the benefit day to account for the loss of tips from not working. *Id.* ¶ 11.

Unlike other tipped employees, banquet servers do not get paid a consistent hourly wage. Instead, they are paid by the function they work. *Id.* ¶ 13. Thus, to calculate a banquet server's benefit day pay rate, the IWA provides that the Hotel use an a la carte server's hourly rate. IWA at 42–43. Thus, the Hotel calculates a banquet server's benefit day pay rate by taking the a la carte server's hourly rate of pay ($19.435), doubling that hourly rate ($38.87), and multiplying that amount by eight hours ($310.96). *Id.* ¶¶ 10–13.

## B. The Hotel's Contemplated Redevelopment Project

In 2019, the Hotel contemplated selling the hotel to a third party "so that it may be demolished to develop a new mixed-use project with a hotel, office, and a retail portion."

2

Kaiser Decl., Ex. C ("02/01/2019 Agr.") at 2.  In anticipation of this project (the "Redevelopment Project" or "Project"), on February 1, 2019, the Hotel and the Union entered into a redevelopment agreement ("Redevelopment Agreement"), in which the Hotel agreed that if it proceeded with the Project, it would serve formal notice to the Union and offer hotel employees "Enhanced Severance Pay." *Id.*  To date, the Hotel has not provided the Union with a notice of closing.  Def. Mem. at 7.  Thus, the obligation to offer Enhanced Severance Pay under the Redevelopment Agreement has not been triggered.

### C.  The Banquet Servers' 2019 Lawsuit

Against this factual backdrop, the Banquet Servers initiated two actions—a 2019 action and the present action—against the Hotel and the Union.  The Court reviews the 2019 action here, because the terms of the settlement agreement (the "Settlement Agreement") that resolved it are central to the present action.

On July 19, 2019, the Banquet Servers sued the Hotel and the Union, alleging that they conspired to fraudulently deprive the Banquet Servers of compensation owed under the IWA. Kaiser Decl., Ex. A.  In October 2019, the parties entered into a written Settlement Agreement, and the lawsuit, on motion of the Banquet Servers, was dismissed with prejudice.  *Id.*, Ex. B. ("10/2019 Agr.").[1]

Pertinent here, the Settlement Agreement provided as to severance pay:

> The Hotel shall offer enhanced severance pay to all employees, including Banquet Servers, in accordance *with the agreement, dated February 1, 2019* [*i.e.*, the Redevelopment Agreement], by and between the Grant Hyatt New York and the New York Hotel and Motel Trades Council, AFL-CIO, which includes the requirement to sign a general release.

*Id.* at 7 (Paragraph 4) (emphasis added).

---

[1] The record of this proceeding does not disclose why no party moved to compel arbitration of that action as provided by Article 26 of the IWA.  *See* IWA at 35–36.

The Settlement Agreement thus defined its severance pay calculation with reference to the "Redevelopment Agreement" between the Hotel and the Union dated February 1, 2019. 02/01/2019 Agr. at 2. The Redevelopment Agreement provides that it "shall become effective" if the Hotel decides to sell "the existing hotel to a third party so that it may be demolished to develop a new mixed-use project with a hotel, office, and a retail portion (the "Project")." *Id.* It also provides that, if the Hotel proceeds with the Project, the Hotel must "provide notice to the Union that the Hotel is closing due to demolition." *Id.* Upon such notice, Hotel employees may "elect to receive Enhanced Severance Pay and cease employment immediately." *Id.*[2] (cleaned up). Paragraph 2(a) defines Enhanced Severance Pay as "IWA Article 52 severance pay plus an additional amount equal to twenty-six (26) days of pay for each year of service, for a total of thirty (30) days of pay for each year of service." *Id.* And Paragraph 2(g) provides: "All tipped employees shall get paid twice the aforementioned number of days of Enhanced Severance Pay calculated *in accordance with the formula in IWA Article 52*." *Id.* at 4. (emphasis added).

Article 52 of the IWA, referenced in the Redevelopment Agreement, provides:

> For the purpose of calculating severance pay, the EMPLOYER shall pay over to the UNION for distribution by the UNION to the employees affected an amount equal to four (4) days of regular wages for each year of service for each affected employee provided the employee was employed for not less than six (6) months' service. Tip employees shall receive twice the amount of severance pay calculated in accordance with the above formula.

IWA at 58.

---

[2] As noted above, it is undisputed that the Hotel has not provided the Union with a notice of closing so as to trigger the offer of 30 days of Enhanced Severance Pay under the Redevelopment Agreement. Dkt. 28 at 7.

The Settlement Agreement also contained a mandatory arbitration provision, requiring that any dispute or matter "be submitted to the Office of the Impartial Chairperson for final and binding resolution in accordance with the IWA." 10/2019 Agr. at 4.

### D.  The COVID-19 Pandemic and the 2022 Side Agreement

In 2020, the COVID-19 pandemic struck New York City's hotel industry, requiring the Hotel to temporarily close.  The Hotel's food and beverage operations, including the Banquet Department, remained closed from the pandemic's onset until at least August 2022.  Dkt. 27 ("Grosso Decl.") at 3.  As a result, in August 2022, the Hotel and the Union entered into another agreement, which they refer to as the "2022 Side Agreement."  Grosso Decl. & Ex. 3 ("08/2022 Agr.").  That agreement states that it was entered into because the Project contemplated under the Redevelopment Agreement remains "uncertain" and had not yet been finalized, and because, until it was resolved, "the Hotel does not intend to fully reopen its Food and Beverage operations at the Hotel, including the Banquet Department," which had been closed since March 2020. 08/2022 Agr. at 1.  In the 2022 Side Agreement, the Hotel agreed to offer all Food and Beverage Department employees, including Banquet Servers, severance days in the amount of "fifteen (15) days per year of service at the Hotel"— "equivalent to half of the number of days owed under the [Redevelopment Agreement]." *Id.*  The 2022 Side Agreement contained a "Grievance and Arbitration" provision stating that all disputes between the parties arising from it were "subject to the grievance and arbitration provision of the IWA." *Id.* at 3.

In August 2022, the Hotel held meetings with Banquet Servers and offered to pay them 15 days of enhanced severance pay per year of service, pursuant to the 2022 Side Agreement. Grosso Decl. at 3.  As to each worker's daily severance pay rate, the Hotel proposed to use the banquet server's "benefit rate of pay." *Id.*  The Banquet Servers, however, rejected this proposal.

5

They contended that they are entitled to 60 days—not 15—of enhanced severance pay per each year of service under the Settlement Agreement, insofar as that agreement incorporates by reference the Redevelopment Agreement. *Id.*

### E.  The Banquet Servers' Commencement of This Action

On October 12, 2022, the Banquet Servers commenced this lawsuit, suing the Hotel and the Union. Dkt. 1 ("Complaint"). They alleged breaches of (1) the duty of fair representation by the Union; (2) the October 2019 Settlement Agreement and the IWA, by the Hotel; and (3) the October 2019 Settlement Agreement, by the Union. *Id.* at 7–8. Each claim arose from the premise that the Banquet Servers were entitled under the Settlement Agreement to severance pay measured by 60 days per year of service at the benefit rate of pay, and that the Hotel and the Union had conspired to deprive Banquet Servers of this amount of severance pay.

On November 7, 2022, the Hotel and the Union sought an extension of the deadline to respond to the Complaint because the parties were working towards an agreement under which the dispute would be resolved in arbitration. Dkt. 9. The Court granted the extension. Dkt. 10. On November 22, 2022, the parties reported an agreement as to the terms of arbitration and that an arbitration hearing before the Office of the Impartial Chairperson was scheduled for January 19, 2023. Dkt. 11. The Court stayed the case until May 15, 2023, to facilitate the arbitration. Dkt. 14.

### F.  The Arbitration and the Award

An "Impartial Chairperson," Elliott Shriftman, held arbitral hearings on January 27 and March 16, 2023, after which the Hotel, the Union, and the Banquet Servers each submitted post-hearing briefs. *See* Kaiser Decl., Ex. G ("Award") at 2.

The Hotel argued that the Banquet Servers are entitled to 15 severance days per year of service at the benefit rate of pay of $310 per day pursuant to the 2022 Side Agreement. The Hotel argued that the 2019 Redevelopment Agreement does not itself govern the dispute because that Agreement never took effect, as the Hotel had never provided the Union with a notice of closing that would trigger the obligation under the 2019 Redevelopment Agreement to offer Enhanced Severance Pay. *Id.* at 3. The Hotel argued that, for similar reasons, the Settlement Agreement's reference to the Redevelopment Agreement did not trigger the obligation under the latter to pay the Banquet Servers 30 severance days per year of service at the benefit rate of pay. Such an entitlement, it argued, would be triggered only by notice of the hotel's closure due to demolition, which had not occurred. Therefore, the Hotel argued, the 2022 Side Agreement governed, and under it, the Banquet Servers were entitled to 15 days of severance days per years of service at the benefit rate of pay of $310 per day. *Id.* at 3–7. The 2022 Side Agreement, the Hotel argued, had been entered into "because the redevelopment deal contemplated in the 2019 [Redevelopment] Agreement was still uncertain and the [Food and Banquet] Department, including Banquets, remained closed since the onset of the Covid-19 pandemic." *Id.* at 4.

In opposing the Banquet Servers' argument that they are entitled to 60 severance days per year of service under the Settlement Agreement, the Hotel also noted that it currently doubles a tipped employee's regular rate of pay for the purpose of calculating benefit and severance pay to account for the fact that tipped employees cannot earn tips in conjunction with their wages. *Id.* The Hotel argued that if Paragraph 2(g) of the Redevelopment Agreement required doubling the severance days for tipped employees "on top of an inherently doubled rate of pay," then tipped employees would effectively be receiving four times their normal rate of pay. *Id.* at 7. The Hotel contended that this is "not what Article 52 requires nor what the parties intended." *Id.*

The Union and the Banquet Servers argued that the Enhanced Severance Pay terms set out in the Redevelopment Agreement applied, via the incorporation of those terms in the Settlement Agreement, which they contended governed. *Id.* at 8–15. The 2022 Side Agreement did not govern, they argued, because "none of the Banquet Servers actually signed the individually applicable August 2022 severance agreements specific to each Banquet Server because those agreements did not honor the Hotel's contractual obligation to double the number of severance days for Banquet Servers." *Id.* at 12. And, they argued, the Redevelopment Agreement's Enhanced Severance Pay definition was incorporated into the Settlement Agreement, such that that definition applied even if the Redevelopment Agreement was not itself triggered. *Id.* at 13. Thus, they argued, the Banquet Servers "have a direct legal claim" under the Settlement Agreement for the enhanced severance terms. *Id.* at 12. And they claimed, the Union's actions following execution of the settlement agreement—including entering into the 2022 Side Agreement—could not "impede or impair the Banquet Servers' contractual right" to the enhanced severance payment. *Id.*

The Banquet Servers further argued that under the Settlement Agreement, which incorporates by reference the Redevelopment Agreement, each Banquet Server is entitled to 60 severance days per year of service at the benefit rate of pay of $310 per day. *Id.* at 8–15. They argued that the Hotel's alternative severance pay calculation in the arbitration "failed to provide for doubling of the number of days of pay for each year of service as required for tipped employees under Paragraph 2(g)" of the Redevelopment Agreement. *Id.* at 8. In so arguing, the Banquet Servers reasoned as follows. The Settlement Agreement provides for Enhanced Severance Pay in accord with the Redevelopment Agreement. Paragraph 2(a) of the Redevelopment Agreement, in turn, defines Enhanced Severance Pay as "IWA Article 52

8

severance pay plus an additional amount equal to twenty-six (26) days of pay for each year of service" for a total of 30 days of pay for each year of service. 02/01/2019 Agr. at 2; *see* Award at 8. Paragraph 2(g) of the Redevelopment Agreement, in turn, requires that tipped employees "get paid twice the aforementioned number of days of Enhanced Severance Pay." 02/01/2019 Agr. at 4. Thus, the Banquet Servers argued, a tipped employee was entitled to 60 severance days per year of service. And his or her daily rate of pay for each "severance day" would be identical to the "benefit day" rate, which is $310 per day.

The issue litigated in arbitration, as framed by the Impartial Chairperson, was "how to calculate severance pay for [the] Banquet Servers pursuant to the 2019 redevelopment agreement and the IWA." Award at 2. On April 20, 2023, the Impartial Chairperson issued the Award, which resolved that question. The Impartial Chairperson began by recapping, in detail, the arguments by each side. *Id.* at 3–15. He then construed and applied paragraphs 2(a) and 2(g) of the Redevelopment Agreement, which the Settlement Agreement incorporated by reference. *Id.* at 15–18. Implicitly rejecting an argument by the Hotel, the Impartial Chairperson's decision did not analyze or mention the 2022 Side Agreement. *Id.* Thus, on the parties' threshold dispute as to which contract governs the issue—the 2022 Side Agreement or the Settlement Agreement incorporating the formula in the Redevelopment Agreement—the Impartial Chairperson sided with the Banquet Servers that the Settlement Agreement (and the Redevelopment Agreement formula referenced therein) governs.

On the question of how to calculate severance pay under those documents, however, the Impartial Chairperson rejected the Banquet Servers' bid for payment of 60 severance days. *Id.* at 18. He reasoned that Paragraph 2(g) of the 2019 Redevelopment Agreement cites to "Article 52's severance pay calculation" which already "doubles the daily pay rate for tipped employees."

9

*Id.* The Chairperson explained that if Paragraph 2(g) had not referenced the Article 52 formula, then the Union and the Banquet Servers' tabulation would have prevailed. But the reference to Article 52's severance pay formula left the Impartial Chairperson with "no doubt that the parties did not intend to actually double the number of days paid in the manner sought by the Union and the Claimants." *Id.* at 18. That is because, he stated, Article 52's severance pay formula already "doubles the daily pay rate for tipped employees." *Id.* The Impartial Chairperson found it implausible that the parties would have intended to also double a tipped employee's number of severance days, amounting to a tipped employee being paid four times more severance than a non-tipped employee. *Id.*

### G. The Motions to Vacate and Confirm the Award

On May 5, 2023, the Banquet Servers moved to vacate the Award, Dkt. 15, and, in support, filed a memorandum of law, Dkt. 17 ("Pl. Mem."), and a declaration from Daniel Kaiser, Dkt. 16. On May 31, 2023, the Hotel cross-moved to confirm the Award, Dkt. 25, and, in support, submitted a memorandum of law, Dkt. 28 ("Def. Mem."), and declarations from Michael Grosso, Dkt. 27, and Jaclyn Ruocco, Dkt. 26. The same day, the Hotel answered the Complaint. Dkt. 29.[3]

## II.   Applicable Legal Standards

The FAA provides a "streamlined" process for a party seeking a "judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008).

---

[3] On May 31, 2023, the Union moved to dismiss the Complaint, Dkt. 22. That motion is moot, however, because on July 13, 2023, the Banquet Servers voluntarily dismissed the Union as a defendant, with prejudice. Dkt. 37.

10

### A.    Vacatur

Judicial review of arbitral awards is "severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reins. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (citations and internal quotation marks omitted).  A reviewing court owes "strong deference" to "arbitral awards and the arbitral process," *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007), such that a party seeking to vacate an arbitral award "must clear a high hurdle," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

"It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Id.* (citations omitted).  Rather, under the FAA, "[i]f there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award." *Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) (quoting *In re Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)).  Courts have authority to vacate arbitral awards only in narrow, enumerated circumstances, such as "where there was evident partiality or corruption in the arbitrators," 9 U.S.C. § 10(a)(2); "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown," *id.* § 10(a)(3); or "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," *id.* § 10(a)(4).

The Second Circuit has held that an arbitral award may also be vacated if it "exhibits a 'manifest disregard' of the law." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91 (2d Cir. 2008), *rev'd and remanded on other grounds*, 559 U.S. 662 (2010) (citation omitted).  But the manifest disregard standard, rather than substantially broadening the grounds for vacatur,

largely operates "as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Id.* at 94. Vacatur of an arbitral award for manifest disregard of the law "is a doctrine of last resort," reserved for "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003). Manifest disregard of the law "means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986) (citations omitted). It applies where: (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him." *Duferco Int'l Steel Trading*, 333 F.3d at 390 (citation omitted).

## B. Confirmation

The confirmation of an arbitral award generally is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (citation and internal quotation marks omitted). In this Circuit, "[t]he showing required to avoid summary confirmation of an arbitration award is high." *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 12 (citation omitted). But "[a]rbitration awards are not self-enforcing"; "they must be given force and effect by being converted to judicial orders by courts." *Power Partners MasTec, LLC v. Premier Power Renewable Energy, Inc.*, No. 14 Civ. 8420 (WHP), 2015 WL 774714, at *1 (S.D.N.Y. Feb. 20, 2015) (citation and internal quotation marks omitted).

"A petition to confirm an arbitral award is 'treated as akin to a motion for summary judgment.'" *STX Pan Ocean Shipping Co. v. Progress Bulk Carriers Ltd.*, No. 12 Civ. 5388 (RJS), 2013 WL 1385017, at *2 (S.D.N.Y. Mar. 14, 2013) (quoting *D.H. Blair & Co.*, 462 F.3d at 109)). To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## II.    Discussion

### A. Vacatur

In moving to vacate the Award, the Banquet Servers raise two challenges: that (1) the Impartial Chairperson exceeded his authority; and (2) the Impartial Chairperson manifestly disregarded the law.[4]  The Court addresses each argument in turn.

### 1.    The Impartial Chairperson Did Not Exceed His Powers

The Banquet Servers contend that the Impartial Chairperson based his ruling not on the Settlement Agreement, but instead on his "industry wide obligations," Pl. Mem. at 7, and on "unstated 'industry' considerations," *id.* at 8.  In so arguing, the Banquet Servers rely on references in the Award to the Impartial Chairperson's status as a "permanent industry arbitrator" as opposed to an "ad hoc arbitrator," and to the responsibility of such an arbitrator to "reach decisions with the entire industry in mind" and to be "attentive to awards written by their colleagues addressing the same or similar issues because they are appropriately precedential or highly persuasive." Award at 16.  Based on these statements, the Banquet Servers contend that the Impartial Chairperson exceeded his powers, in contravention of 9 U.S.C. § 10(a)(4).

That argument is quickly put aside.  The FAA permits vacatur of an arbitral award where the arbitrators "exceeded their powers," 9 U.S.C. § 10(a)(4), but the Second Circuit has "consistently accorded the narrowest readings" to the FAA's authorization to vacate an award pursuant to § 10(a)(4). *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) (citation omitted).  The inquiry under § 10(a)(4) "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach

---

[4] At points in its briefing, the Banquet Servers conflate these two arguments.  In the interest of clarity, the Court addresses them distinctly.

a certain issue, not whether the arbitrators correctly decided that issue." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 220 (2d Cir. 2002) (citation omitted).

That standard is not met here—or close.  A fair reading of the Award reflects that the Impartial Chairperson, whether right or wrong in his analysis, grounded it in his construction of the operative agreements.  To the extent the Banquet Servers fault the Impartial Chairperson for—as context or preface to his construction—acknowledging that industry norms can be germane to contract construction and that permanent industry arbitrators will look for guidance to apposite such awards by fellow such arbitrators, these statements did not reveal a lack of authority on the part of the Impartial Chairperson to issue such a decision.  This challenge instead goes to the merits of—the reasoning behind—the Impartial Chairperson's decision, not his *authority* to issue such a decision.  Such is not a proper basis for a challenge under § 10(a)(4). *See, e.g.*, *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 123 (2d Cir. 2011) (district court erred in vacating arbitral award under § 10(a)(4) when it "engage[d] in a substantive review of the arbitrator's decision" instead of examining "whether the arbitrator exceeded her authority"); *Wells Fargo Advisors LLC v. Tucker*, 373 F. Supp. 3d 418, 424 (S.D.N.Y. 2019) (petitioner must do more than show "that the [arbitrator] committed an error" when seeking to vacate an award pursuant to § 10(a)(4)); *Glob. Gold Min. LLC v. Caldera Res., Inc.*, 941 F. Supp. 2d 374, 387 (S.D.N.Y. 2013) (the issue of "whether the arbitrator's factual and legal conclusions . . . were correct" is irrelevant to a § 10(a)(4) challenge, because "the question whether an issue was correctly decided does not bear on whether the arbitrator was within its power to decide it.").

It is beyond dispute that the Impartial Chairperson had the authority to resolve that very issue.  The Banquet Servers do not dispute that the matter was "properly submitted in the first instance" to the Impartial Chairperson.  *Agility Pub. Warehousing Co. K.S.C. v. Supreme*

*Foodservice GmbH*, 840 F. Supp. 2d 703, 711 (S.D.N.Y. 2011), *aff'd*, 495 F. App'x 149 (2d Cir. 2012).  Quite to the contrary, on November 22, 2022, the parties, including the Banquet Servers, notified the Court that they had "confirmed in principle their agreement to arbitrate [the] contract construction issue," Dkt. 9, and proceeded to submit to the arbitrator the question of how Enhanced Severance Pay was to be calculated under the Settlement Agreement, Dkt. 11.

The Banquet Servers also do not contend that the Impartial Chairperson, in the Award, "rule[ed] on issues not presented to them by the parties." *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 515 (2d Cir. 1991) (cleaned up).  In resolving how to calculate severance pay for Banquet Servers pursuant to the Redevelopment Agreement and the IWA as referenced in the Settlement Agreement, the Impartial Chairperson abided by the parties' framing of the issue at the hearings and in post-hearing briefs.  Award at 2.  The Banquet Servers thus are wrong to invoke § 10(a)(4) to challenge the correctness of a decision "which all concede to have been properly submitted [to arbitration] in the first instance." *Agility Pub. Warehousing*, 840 F. Supp. 2d at 711.

### 2. The Impartial Chairperson Did Not Manifestly Disregard the Law

The Banquet Servers next challenge the Award on the ground that the contract construction undertaken by the Impartial Chairperson entailed a manifest disregard for the law. The Second Circuit has "recognized [this] judicially-created ground" for vacatur, "namely that an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law." *Jock*, 646 F.3d at 121 (citation and internal quotation marks omitted).  However, the "manifest disregard" exception is rarely invoked successfully.  "Mere error in the law or failure on the part of the arbitrator to understand or apply the law is not sufficient to establish manifest disregard of the law." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d

16

Cir. 1997) (cleaned up).  Instead, a party seeking to vacate an arbitral award on the basis of

manifest disregard must show that: "(1) "the law that was allegedly ignored was clear, and in fact

explicitly applicable to the matter before the arbitrators," (2) "the law was in fact improperly

applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and

its applicability to the problem before him." *Duferco Int'l Steel Trading*, 333 F.3d at 390.

     That standard is daunting to meet in the context of a contract dispute.  In that context, the

Supreme Court has instructed, "it is only when an arbitrator strays from interpretation and

application of the agreement and effectively dispenses his own brand of industrial justice that his

decision may be unenforceable." *Stolt-Nielsen*, 559 U.S. at 671 (cleaned up).  Arbitral awards

turning on the construction of a contract therefore must be confirmed even if a reviewing court

has "serious reservations about the soundness of the arbitrator's reading of [the] contract."

*Westerbeke*, 304 F.3d at 216 n.10.  "Whether the arbitrators misconstrued a contract is not open

to judicial review." *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 203 n.4 (1956)

(citations omitted).  "[V]acatur for manifest disregard of a commercial contract is appropriate

only if the arbitral award contradicts an express and unambiguous term of the contract or if the

award so far departs from the terms of the agreement that it is not even arguably derived from the

contract." *Westerbeke*, 304 F.3d at 222; *see also T. Co. Metals, LLC v. Dempsey Pipe & Supply,*

*Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) ("With respect to contract interpretation, [the manifest

disregard] standard essentially bars review of whether an arbitrator misconstrued a contract.").

     Measured against that standard, there was no manifest disregard here.  The operative

contract language in this case is Paragraph 4 of the Settlement Agreement.  It requires the Hotel

pay "enhanced severance pay to . . . Banquet Servers, in accordance with the agreement, dated

February 1, 2019 [*i.e.*, the Redevelopment Agreement]." 10/2019 Agr. at 3.  Paragraph 2(a) of

the Redevelopment Agreement in turn defines Enhanced Severance Pay as "IWA Article 52 severance pay[5] plus an additional amount equal to twenty-six (26) days of pay for each year of service, for a total of thirty (30) days of pay for each year of service." 02/01/2019 Agr at 2. Paragraph 2(g) of the Redevelopment Agreement further provides: "All tipped employees shall get paid twice the aforementioned number of days of Enhanced Severance Pay calculated in accordance with the formula in IWA Article 52." *Id.* at 4.

The Banquet Servers' argument under these provisions emphasizes that Paragraphs 2(a) and 2(g) of the Redevelopment Agreement entitle tipped employees like banquet servers to 60 severance days for each year of service. Paragraph 2(a) entitles all employees—tipped and non-tipped—to 30 severance days for each year of service. And Paragraph 2(g) provides that the "aforementioned number of days of Enhanced Severance Pay" calculated in Paragraph 2(a) to be doubled for tipped employees. Thus, the Banquet Servers argue, insofar as the Redevelopment Agreement is incorporated by reference by the Settlement Agreement, they, as tipped employees, should receive double the number of severance days provided for in Paragraph 2(a) (30 days), for a total of 60 severance days. The Banquet Servers argue that the Impartial Chairperson erred in finding them entitled to a lesser number of severance days.

The Banquet Servers' interpretation of Paragraphs 2(a) and 2(g) has undeniable force. Were the Court reviewing this question of construction *de novo,* it is entirely possible that the Court would find that interpretation to carry the day. But as the assembled case law reflects, the issue before the Court is not the correctness of the Impartial Chairperson's construction, or even whether its reading was sound or logically defensible. It is whether that decision had an anchor

---

[5] IWA Article 52 severance pay is "four (4) days of regular wages for each year of service." IWA at 58.

in the terms of the Settlement Agreement, such that the Award was "arguably derived" from that agreement. *Westerbeke*, 304 F.3d at 222; *see, e.g.*, *Benihana Inc. v. Benihana of Tokyo, LLC*, No. 18 Civ. 7506 (PAE), 2019 WL 251729, at *7 (S.D.N.Y. Jan. 17, 2019) (confirming an arbitral award because it was arguably derived from the terms of that contract even though the Court would have reached a different outcome on *de novo* review). Here, as a review of the reasons stated in the Award for that decision reflects, the Chairperson's application of Paragraphs 2(a) and 2(g) of the Redevelopment Agreement had such an anchor in the contractual text, which the Settlement Agreement expressly incorporated.

The Impartial Chairperson's Award in fact prefaced its analysis with a recognition of the duty to anchor its decision in contract language. *See* Award at 16. In the Award, the Impartial Chairperson then reviewed the operative rules of construction. Arbitrators, he stated, must "follow the canons of construction, those judicially conceived, logic-based rules, in performing that task." *Id.* These rules require a jurist to "read and apply contract language as written, that is, [not to] add to or subtract from the words written by the parties themselves." *Id.* These also require a jurist "to read language plainly, giving words their ordinary meaning unless terms of art used." *Id.* Further, "[a]rbitrators, in their efforts to fully understand what the parties meant and intended, may look to other provisions in the labor accord on the same or similar topic," and "[o]nly where there is ambiguity may we look to extrinsic evidence." *Id.* at 16–17. And "[p]ast practice is simply a gap filler and may be applied only where the contract is silent about the specific rights or obligations under scrutiny." *Id.* at 17.

The Impartial Chairperson then undertook his analysis, which on its face attempted to apply those stated canons. Looking to the text of Paragraph 2(g) of the Redevelopment Agreement, he rejected the Banquet Servers' interpretation, on the ground that Paragraph 2(g)

19

also demands that severance pay be "calculated in accordance with the formula in IWA Article 52." 02/01/2019 Agr. at 4.  The Impartial Chairperson reasoned that because Article 52's severance pay calculation formula already "doubles the daily pay rate for tipped employees," the parties "did not intend to actually double the number of days paid in the manner sought by the Union and the [Banquet Servers]" via Paragraph 2(g).  Award at 18.  Drawing on an argument by the Hotel, he noted, doubling the number of severance days on top of an inherently doubled rate of pay would lead to an anomaly of tipped employees being paid four times their normal daily rate of pay and four times the daily rate of pay of non-tipped employees.  Had the Settlement Agreement meant to effectuate such a consequential change, he reasoned, Paragraph 2(g) would have said so, for example, by stating: "All tipped employees shall be paid twice the aforementioned number of days of Enhanced Severance Pay."  Award at 18.  Instead, the Impartial Chairperson noted, Paragraph 2(g) provides: "All tipped employees shall be paid twice the aforementioned number of days of Enhanced Severance Pay *calculated in accordance with the formula in IWA Article 52*."  Award at 17 (emphasis added).  Thus, in an act of textual construction, the Chairperson found the Redevelopment Agreement's express "tie-in to Article 52's severance pay calculation formula" to significantly undermine the Banquet Servers' construction.  *Id.* at 18.

The Banquet Servers critique this reading.  They contend that it effectively reads out the language of the Redevelopment Agreement that requires doubling the aforementioned days for tipped employees.  *See* 02/01/2019 Agr. at 4.  There is force to the argument that the Banquet Servers' alternative construction is superior.  But even so, insofar as the Award's contract construction was explicitly anchored in the contract text, the Court does not have a charter to vacate the Award.  By any reasonable reading, the Award articulated at least "a barely colorable

justification for the outcome reached," *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 13 (citation omitted), and its stated reason for rejecting the doubling of the number of severance days for Banquet Servers had an anchor in, and "dr[ew] its essence from," the terms of the Settlement Agreement and the Redevelopment Agreement that it incorporated, *E. Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000) (citation omitted).  The Banquet Servers have not identified governing law which the Award disregarded that yielded the disputed outcome.  *Duferco Int'l Steel Trading*, 333 F.3d at 390.  Because the Award, whether its legal reasoning was adept or maladroit, correct or incorrect, "arguably constru[ed] [and] appl[ied] the contract," the Court lacks authority to overturn it.  *Jock*, 646 F.3d at 122.

This case thus joins a long line in which courts have declined to vacate arbitral awards based on a disputed contractual construction that, right or wrong, was anchored in contractual language.  *See, e.g., Constr. Council 175 v. N.Y. Paving*, Inc., No. 20 Civ. 2732 (KAM) (SJB), 2023 WL 8826771, at *8 (E.D.N.Y. Dec. 21, 2023) (confirming award after finding that "every step of the arbitrator's reasoning at the very least could have been derived from the terms of the [contractual agreement]"); *Rame, LLC v. Popovich*, 878 F. Supp. 2d 439, 452 (S.D.N.Y. 2012) (concluding that arbitrator did not act in manifest disregard of the law when it "analyze[d] the language of the Agreement" and "review[ed] more than eighty pages in legal memoranda, plus supporting documents," even if petitioners disagreed with the arbitrator's ultimate conclusion); *InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 536 (S.D.N.Y. 2005) (confirming award because the arbitrator did not manifestly disregard the law as its "conclusions were grounded in the relevant agreements").

The Court is sensitive to the Banquet Servers' dismay at this result.  Relative to the reading they urge, the Award leaves them with lesser compensation from the Hotel's closing.

The Court is, however, constrained to note that the Banquet Servers' commitment of resolution

of this dispute to arbitration carried the risk of an unsatisfactory construction of their agreement

that was not reviewable *de novo* in court.  The Supreme Court has admonished parties that

contemplate giving up conventional litigation for the expedient of arbitration of the potential

consequences of that choice:

> The potential for [] mistakes is the price of agreeing to arbitration.  As we have held
> before, we hold again: "It is the arbitrator's construction of the contract which was
> bargained for; and so far as the arbitrator's decision concerns construction of the
> contract, the courts have no business overruling him because their interpretation of
> the contract is different from his."  The arbitrator's construction holds, however
> good, bad, or ugly.

*Oxford Health Plans, LLC v. Sutter,* 569 U.S. 564, 572–73 (2013) (quoting *United Steelworkers*

*of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) (alteration omitted)); *see also*

*Benihana*, 2019 WL 251729, at *9.

Finally, although it is not clear that the Banquet Servers—in claiming manifest disregard

of the law—mean to reprise their argument in support of their claim that the arbitrator exceeded

his authority, the Court addresses, and dispatches, that contention.  The Impartial Chairperson's

prefatory references to the permissibility of considering general industry practice, and the results

of analogous arbitrations, would not support a claim of manifest disregard.  The Impartial

Chairperson's statements that a jurist may have proper occasion to consider industry practice and

apposite precedents were not incorrect as general propositions.  *See, e.g.*, *King Fook Jewellery*

*Grp. Ltd. v. Jacob & Co. Watches Inc.*, No. 14 Civ. 742 (ER), 2019 WL 1146461, at *6

(S.D.N.Y. Mar. 13, 2019) ("industry custom or practice" is relevant extrinsic evidence a court

can consider when it interprets ambiguous contractual provisions); *Golden Ins. Co. v. Ingrid*

*House, Inc.*, 538 F. Supp. 3d 293, 309 (S.D.N.Y. 2021), *aff'd*, No. 21-1337, 2022 WL 2165252

(2d Cir. June 14, 2022) (considering relevant case precedent in contract interpretation and

22

rejecting argument to "depart from . . . precedent"). And as the review above makes clear, the Award was explicitly anchored in a textual analysis of the relevant agreements, rather than on extrinsic considerations.

The Court therefore denies the motion to vacate the Award.

### B. Confirmation

The Court turns to the Hotel's motion to confirm the Award. In evaluating the motion to vacate, the Court's review here has gone well beyond the very limited review necessitated by a motion. Based on its review the Court finds that confirmation is warranted, as the Hotel has shown there is no material issue of fact in dispute and that it is entitled to judgment as a matter of law. The Impartial Chairperson acted within the scope of the authority granted him by the parties. *See* Dkts. 9, 11. After convening two hearings and considering post-hearing briefs from the parties, the Impartial Chairperson found that Paragraph 2(g) of the Redevelopment Agreement did not require that the Hotel double the number of severance days. From this, the Court has found that there is at least a "barely colorable justification for the outcome reached." *Willemijn*, 103 F.3d at 13. Accordingly, the Court confirms the Award.

### CONCLUSION

For the foregoing reasons, the Banquet Servers' motion to vacate the arbitral Award is denied and the Hotel's cross-motion to confirm the Award is granted. The Clerk of the Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: January 30, 2024
New York, New York